UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

KARL J. ANDERSON, an individual,

      Plaintiff,

v.

HARVETTE S. SMITH, Chief of Police
of The City of North Miami Beach, in her
official capacity, and THE CITY OF NORTH
MIAMI BEACH,

      Defendants.

_____/

## COMPLAINT

    Plaintiff, Karl J. Anderson ("Anderson"), hereby sues Defendants, Harvette S. Smith ("Chief Smith"), Chief of Police of the City of North Miami Beach, in her official capacity, and the City of North Miami Beach, and alleges as follows:

## NATURE OF THE CASE

    1.    This is an action for declaratory relief, monetary damages, and other relief under Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. 2000e et. seq*., Florida Civil Rights Act of 1992, Fla. Stat. *§760.10*, and *42 U.S.C. §1983*.

    2.    Mr. Anderson is now a retired patrol sergeant from the North Miami Beach Police Department (NMBPD). Mr. Anderson had served the city honorably for 17 1/2 years, had never faced any serious disciplinary action, and had a great relationship with everyone he worked with. This changed when Interim Chief Harvette S. Smith became Chief of Police for the City of North Miami Beach.

3.     Under Chief Smith's administration, Mr. Anderson suffered severe discrimination because of his race, bullying, and baseless administrative actions taken by Chief Smith and her senior staff.

## CONDITIONS PRECEDENT

4.     Plaintiff timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") against Defendants, complaining of the acts of discrimination herein described.

5.     The EEOC issued Plaintiff a letter of determination, dated July 11, 2024, giving Plaintiff the right to sue, which is attached as Exhibit "A".

6.     The deadline to commence a lawsuit after receiving the right-to-sue letter, as required by Title VII, was October 9, 2024.

7.     On October 7, 2024, the Parties executed a tolling extension to the deadline necessary to file a lawsuit, that expired on November 25, 2024.

8.     On November 12, 2024, the Parties executed a second tolling extension to the deadline to file a lawsuit, which expires on December 20, 2024.

9.     Therefore, this Complaint commenced before the deadline established by receipt of the right-to-sue letter as required by Title VII.

10.     Plaintiff has fully complied with all prerequisites and all conditions precedent to this Court exercising jurisdiction pursuant to Title VII and the Florida Civil Rights Act of 1992.

11.     Administrative exhaustion is not required for the §1983 claim.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction of this Action under 28 U.S.C. §1331 and 28 U.S.C. §1343(3) in order to protect rights guaranteed by Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. 2000e et. seq*.

13.     This Court has jurisdiction over the Florida statutory claim under its supplemental jurisdiction as the elements of proof of Title VII and the Florida statutory claims are identical.

14.     Venue is proper in the Southern District of Florida because a substantial part of the events giving rise to this claim arose within its District.

## PARTIES

15.     Plaintiff Karl J. Anderson was formerly employed as a police sergeant with the City of North Miami Beach.

16.     Defendant the City of North Miami Beach is an "employer" as defined in Title VII and the Florida Civil Rights Act of 1992.

17.     The City of North Miami Beach (through Defendant Harvette S. Smith sued in her official capacity), is a Florida "state agency," or "subdivision" and/or a "municipal corporation".

## FACTS

### How it Started

18.     Plaintiff, Mr. Anderson, had been assigned to the midnight shift at the NMBPD as a patrol sergeant (one of two) since February of 2022, directly supervising 15-20 officers.

19.     During a typical midnight shift, six to nine officers would be on duty.

20.     Additionally, Mr. Anderson was the sergeant of the Reserve Officer Program which consists of approximately 12-15 part-time officers, most of whom are retirees from the NMBPD.

21.     Mr. Anderson is a white male.

22.     Around September of 2022, Captain Lino Diaz began clandestinely monitoring the operations of midnight shift resulting in several officers and two sergeants being issued severe reprimands for incidents he observed, many of which were later deemed excessive or unwarranted.

23.     Captain Diaz's conduct eventually led to an officer having a nervous breakdown after he ordered a sergeant to inflate minor violations into a violation that placed the officer's career in jeopardy.

24.     This officer was forced to hire a private attorney as she felt she did not receive adequate representation from the police union. The matter was eventually dropped by administration after arguments from her attorney.

25.     Mr. Anderson personally was issued a reprimand by Captain Diaz which was easily proven to be an erroneous overreach and was immediately dismissed upon review of the evidence by the division Major, Juan Pinillos.

26.     At the same time, Sergeant Andrew Hancsak was issued a reprimand alleging several violations, which included "neglect of duty," "failure to set an example as a commanding officer," and "failure to supervise."  These violations were also later deemed either excessive or unwarranted.

27.     It was this heavy-handed approach by Captain Diaz, as well as his statements to Sergeant Hancsak and Mr. Anderson, that set the clear expectation that Mr. Anderson was to be held directly responsible for the conduct of the officers he supervised and would likely face severe punishment if he did not adequately hold officers accountable in a manner administration deemed appropriate.

28.     On March 30, 2023, Mr. Anderson was informed that five out of six midnight shift officers had called in sick for their regularly scheduled shift, and multiple officers were being held over from the afternoon shift to accommodate the shortage.

29.     The Acting Captain, Sergeant David Foy, was notified of the shift shortage and came to work early to ensure the shift was operational.

30.     Sergeant Foy requested that Mr. Anderson respond to each officer's house to conduct a wellness visit in accordance with departmental policy.

31.     Mr. Anderson conducted each visit but was unable to contact any of the officers and reported his findings to Sergeant Foy.

32.     On March 31, 2023, it was brought to Mr. Anderson's attention, through rumors and hearsay, that members of the "c-shift (midnight shift)" had lodged a formal complaint against Mr. Anderson, alleging he had used racially inflammatory language and was creating a "hostile work environment."

33.     It was also inferred that this coordinated call-out or "blue flu" event whereby the whole squad called in sick was potentially a demonstration or protest related to allegations against Mr. Anderson, and ongoing disciplinary issues on the midnight shift.

34.     Coincidentally on the same day, the results of a survey conducted by the police union were published. The survey highlighted a profound dissatisfaction and lack of confidence with Chief Smith and at least one other administrator.

35.     Additionally, it was revealed that some surveys included dissatisfaction with Mr. Anderson and alleged that Mr. Anderson had called officers "hairless monkeys."

36.     Immediately upon hearing of the rumors, Mr. Anderson contacted Internal Affairs Sergeant Juan Jurado, to defend himself against these rumors and clear up any misunderstanding. Sergeant Jurado told Mr. Anderson to contact Chief Smith and give her his side.

37.     Following the chain of command, Mr. Anderson called Major Juan Pinillos to request permission to speak with Chief Smith via cell phone. Major Pinillos said he would speak to the Chief and arrange a phone call.

38.     Mr. Anderson did not immediately hear back from Major Pinillos so he called Major Pinillos again to see if the Chief would speak to him.  Major Pinillos told Mr. Anderson that she had declined to speak to him. Major Pinillos told Mr. Anderson to allow things to "settle down" and assured Anderson that he would speak to the Chief soon.

**The Disparate Treatment**

39.     On the evening of April 1st, 2023, Mr. Anderson was on duty and summoned to Major Pinillos' office by Sergeant Foy. Mr. Anderson was met by Sergeant Foy, Deputy Chief Ervins Ford and Major Pinillos.

40.     Mr. Anderson was informed he was relieved of duty effective immediately and presented with a departmental memo from Chief Smith advising Mr. Anderson that he was relieved of duty pending an internal investigation.

41.     Mr. Anderson was ordered to surrender his badge, firearm, departmental IDs, and all other assigned equipment which required disrobing from his uniform and duty belt.

42.     Everyone present remarked about their disagreement with how this matter was being handled and that this was Chief Smith's sole decision, despite her administration advising against it.

43.     Mr. Anderson was then escorted outside to the parking lot where he was observed by other employees and subordinates and subsequently given a ride home by a Detective Sergeant who came to work for the sole purpose of taking Anderson home.

44.     Mr. Anderson then spent every weekday confined to his house and having to check in with a dispatcher at 9am and 5pm each day.

45.     Shortly after being relieved of duty, Mr. Anderson learned that Chief Smith had attended midnight shift rollcall and made comments to his squad, remarking on how she was very concerned by the allegations, that they were unacceptable, and that she felt it was necessary to take immediate action and remove Mr. Anderson from the shift.

46.     On April 26th, 2023, Mr. Anderson was contacted by Deputy Chief Ford. He said the investigation was wrapping up, and it was clear, based on the initial findings, that nothing serious had occurred. He requested that Mr. Anderson respond to work and report to Major Stuart Nichols, in administration, until the investigation officially concluded.

47.     Mr. Anderson asked to have his equipment returned but Deputy Chief Ford refused. Mr. Anderson asked to at least be allowed to have his badge and ID so he could be legally armed while off-duty, however, he was only granted the ID for access to the building.

48.     Mr. Anderson reported to Major Nichols, and he explained to Mr. Anderson that his current assignment was to complete a video on behalf of Chief Smith, highlighting her accomplishments as Chief, to be presented to the City Council.

49.     Mr. Anderson was also ordered to follow a cleaning lady around as she cleaned the police station. While engaging in these duties, Mr. Anderson was subjected to demeaning jokes by coworkers and management, all condoned by Chief Smith's administration.

50.     Mr. Anderson was paraded around the entire department in civilian clothing, even in front of the subordinates who filed the libelous complaint against him.

51.     Mr. Anderson was then ordered to resume supervisory responsibilities over the Reserve Officer Program in May of 2023. Even though he was now actively fulfilling his responsibilities as a sergeant, Anderson's multiple requests for reinstatement or the return of his badge, gun, and equipment were repeatedly denied.

52.     From April through July of 2023, instead of working as a uniformed patrol supervisor, Anderson was relegated to the job of "cameraman" in civilian clothes, tasked with creating videos for the Chief while also juggling his sergeant responsibilities for the Reserve Officer Program.

**The Investigation Findings**

53.     Sergeant Juan Jurado was involved in conducting the internal investigation of Mr. Anderson, and Mr. Anderson spoke with Sergeant Jurado periodically before officially reviewing the complaints and providing his statement. Sergeant Jurado stated that there was an obvious effort from some of Anderson's officers to organize a "coup" or "mutiny" against him, essentially because they did not like that Mr. Anderson was holding them accountable, and that Mr. Anderson was too strict in his adherence to policy.

54.     Sergeant Jurado added that the racism allegation had been disproven early on in the investigation, and the significant findings had already been reported to Chief Smith.

55.     Detective Shaunetta Anderson expressed the same sentiments.

56.     On or around May 15, 2023, Sergeant Jurado provided the complaint memos and recorded interviews for Mr. Anderson to review.

57.     Upon reviewing the material, it became clear that the vast majority of complaints were nothing more than benign, routine supervisory interactions with officers. Some examples include:

• Officer Yahuda Topper was upset because Mr. Anderson questioned him about damage to the undercarriage of his vehicle at the request of the Administrative Captain.

• Officer Dukens Jean-Baptiste was upset that Mr. Anderson told him to put his phone away when he was texting and giggling in rollcall.

• Officer Jean-Baptiste was upset that Mr. Anderson informed him a complaint came in about his driving on the Turnpike in which Mr. Anderson reminded him that he's driving a "North Miami Beach billboard" and to be careful.

• Officer Jean-Baptiste was upset when Mr. Anderson sarcastically acted surprised to see he made an arrest.

• Officer Alexander Gonzalez was upset that Mr. Anderson asked his trainee to fix a glaring clerical error on an arrest form and told the trainee it wasn't his fault, that his FTO should've caught it. He stated he felt as though Mr. Anderson was intentionally trying to make him look stupid.

• Officer Gonzalez was upset that Mr. Anderson collected video surveillance from an accident he was involved in and determined he was at fault, resulting in disciplinary action.

• Officer Gonzalez was upset that Mr. Anderson asked him to be more descriptive in establishing probable cause for an arrest on an arrest form.

• Officer Ice Odum was upset that Mr. Anderson told him he made a significant error on a previous subject check of his when he asked for Mr. Anderson's opinion on it in rollcall. When spoken to after rollcall in the presence of Sergeant Andrew Hancsak, Officer Odum, who was fresh off probation, began attempting to argue with them and demonstrated a profound ignorance of the law and his responsibilities as a police officer. Officer Odum was informed of multiple points of failure on the call, the most significant of which being his failure to confer with a supervisor when he wasn't confident in his decision-making abilities.

• Officer Daniel Perez, who was Officer Odum's backup officer during the above incident and equally junior in experience, was upset when Mr. Anderson stated "you don't know your fucking job" in response to an insubordinate comment he made while discussing the matter with Sergeant Hancsak and Mr. Anderson.

• Officer Miguel Estevez was upset because he was not assigned his preferred zone due to him not being present in rollcall to request it, and other officers not deferring the zone to him.

58.    These appear to be the main points of contention for the officers, which they believed were creating a "hostile work environment" as revealed by their formal interviews.

59.    However, it became apparent that what would have otherwise been determined to be a basic and appropriate instance of effective first-line supervision was twisted into a serious allegation and political emergency after officers willfully misrepresented an innocuous phrase Mr. Anderson had used in rollcall.

60.    Some officers in the complaints stated that Mr. Anderson had called officers "hairless monkeys" and inferred that it was evidence of racism and discrimination.

61.    The phrase Mr. Anderson had used in rollcall was in the context of use of force, police brutality, and duty to intercede and was said in the following manner:

> "Be careful because at the end of the day we are all just hairless monkeys who've evolved to hunt something down and kill it. Overriding this instinct requires regular training, situational awareness, and direct communication with each other, and will mean the difference between a justifiable or unjustifiable use of force".

62.    This, or some variation of this statement, is what Mr. Anderson has said in multiple rollcalls. This was a statement of collective humility and self-awareness, meant to add levity to an important discussion about police use of force and the duty to intercede.

63.    Mr. Anderson also regularly added further clarification, that if he, or any other supervisor is perceived as using inappropriate force, then he is preemptively ordering the officers to step in and stop it. Mr. Anderson made the point that all officers need to watch out for each other in all areas of safety and liability.

64.     It is not likely that the phrase complained of could have been genuinely perceived as offensive by anyone given the actual setting and context. Instead, based on all available evidence gathered in this investigation, this statement was willfully contorted and misconstrued by disgruntled officers to supplement their otherwise ill-conceived complaints against Mr. Anderson and deflect accountability for their unethical and unbecoming conduct after organizing a "blue flu".

65.     The internal affairs interviews also revealed certain officers intentionally spread rumors about Mr. Anderson to black officers to convince them Mr. Anderson was racist, attempting to ruin his previously spotless reputation as a supervisor.

66.     The internal affairs investigation revealed this mass complaint campaign was coordinated by officers sharing their collective gripes about Mr. Anderson amongst each other, and many just copied and pasted each other's complaint memos.

67.     The Department did not discipline these officers for their actions nor discipline them for organizing a "blue flu."

68.     Many memos submitted by the complaining officers in the official investigation contained a deluge of personal attacks against Mr. Anderson's character rather than a substantive report of actual wrongdoing.

69.     An important contributing dynamic of these complaints was an ongoing dissatisfaction from administrators with the performance of the midnight shift regarding productivity and conduct.

70.     A common complaint from several officers during the interviews for Mr. Anderson's internal affairs investigation was that he was "constantly writing people up." However, these officers could not point to an instance in which they personally were issued a reprimand, and

it became clear that they were only perpetuating gossip, rumors, and conspiracy theories about Mr. Anderson.

71.     The only officer who had actually been issued a reprimand during this time was Officer Robert Elder, who refrained from contributing to the false allegations against Mr. Anderson despite his disagreement with the reprimand he had been issued.

72.     The one other pending disciplinary measure around this time was that of Officer Perez, who called out sick to attend the wedding of a co-worker, resulting in an off-duty extra detail being canceled due to an officer being pulled to cover the shortage created by Officer Perez's call out. Mr. Anderson had firsthand knowledge of this violation because he was at the wedding.

73.     Officer Perez was to be issued a written counseling for his violation, however, Mr. Anderson was relieved of duty prior to presenting him with the memo and was later told no corrective action would be taken due to the length of time that had passed. Mr. Anderson believes this pending disciplinary matter was somehow revealed to Officer Perez and contributed to his decision to participate in the "blue flu."

74.     Sergeant Jurado stated his investigation was finished and presented it to Chief Smith for review on May 25, 2023.

**More Disparate Treatment**

75.     Sergeant Jurado stated Mr. Anderson was found to have been exonerated, and furthermore, some officers had been implicated in a new internal investigation due to their conduct and information revealed during this investigation.

76.     It had been uncovered during the investigation that drafts of the complaint memos were circulated in email between each complainant officer in an apparent effort to coordinate a mass complaint campaign against Mr. Anderson.

77.    Mr. Anderson was reinstated as a patrol sergeant in late July of 2023; however, he was placed on day shift against his will because Chief Smith had yet to sign off on Sergeant Jurado's report.

78.    Sergeant Jurado could not provide an explanation for the delay and said the Chief had questions about some things that she wanted him to answer before signing off on the report.

79.    Around this time, there was a promotional exam announced for a captain's position. Mr. Anderson felt compelled to take a role in senior leadership because he wanted to bring about positive change for the agency.

80.    Mr. Anderson conferred with Major Nichols about his eligibility to take the exam due to his investigation which had not yet been formally closed. The Major stated it was clear that Mr. Anderson would be exonerated in the investigation and assured him that he is eligible to take the promotional exam.

81.    Mr. Anderson dedicated a lot of time and energy to studying and he took the test on August 28th, 2023. Approximately 2 weeks later, there was a departmentwide email sent out explaining that Mr. Anderson had passed the test with the highest score out of all the candidates.

82.    On September 14, 2023, Mr. Anderson was summoned to Major Pinillos's office to meet with Major Pinillos and Deputy Chief Ford regarding the findings of the investigation. Mr. Anderson was told that out of four potential violations alleged during the initial complaint, two were exonerated and two were sustained.

83.    The first sustained violation was for using offensive language.

84.    NMBPD Harassment/Discrimination Procedural Directive (PD #13-89) section 1.0 Policy states that no person shall be subjected to derogatory remarks, offensive jokes comments of a sexually suggestive nature, or demeaning language or gestures relating to his /her age, gender,

sexual orientation, race, color, religion, weight, marital status, national origin, disability, pregnancy, familial status, or genetic information.

85.     In one previous instance, it was alleged that a Cuban Sergeant named Alexander Capote was overheard by a Haitian IT technician saying that Haitians were a virus in the city (North Miami Beach).

86.     That Sergeant was investigated by internal affairs but faced no adverse action.

87.     In Mr. Anderson's investigation, when the Officers were asked if any other supervisors made remarks that could be offensive to others, they all acknowledged by stating "yes" because it's part of the police culture.

88.     When asked, the officers involved in Mr. Anderson's complaint could not explain why a complaint was only filed against Anderson.

89.     Under the discipline matrix, this violation is categorized under "Conduct" Violations Relating to Inappropriate Comments and Gestures. The recommendation for this violation is "Pistol" and or "Written Counseling."

90.     The most alarming portion of the investigation memo can be found in the following paragraph:

> "When the officers were asked if any other supervisors made joking remarks or remarks that could be offensive to others, they all acknowledged by stating yes because it's part of the police culture. The officers could not explain why it was only Sergeant Anderson that a complaint was filed towards. Many stated there are rumors of Sergeant Anderson going after others to discipline them; however, no one could state an actual occurrence or example."

91.     Selective enforcement and unequal treatment was thoroughly documented in the Blue Courage Assessment Survey of the NMBPD, released in early September of 2023. The offense selectively gleaned from Mr. Anderson's comment was not based on what was said, but

rather who said it. The above excerpt from the memo shows that Mr. Anderson is being treated differently than his peers.

92.     The next violation sustained in the memo is written as "Commanding Officer Failure to Set an Example."

93.     The NMBPD Department Rules and Regulations (DRR) states that under the General Administrative Duties of Supervisors (Chapter 2), section 2.13, subsection 2.13.15, Supervisor to Set Example for Subordinates: Supervisors are to assure success in the performance of the basic duties of members and employees, it is imperative that the supervisors set examples to subordinates in energy, fidelity, sobriety, courtesy, courage, skill, and discipline.

94.     The majority of the officers who did not write memorandums but were interviewed, stated that morale was very low under Sergeant Anderson's command. Under the discipline matrix, this violation is categorized under "Performance/Miscellaneous" Commanding Officer Failing to set an Example. The recommended application for this violation is a "Written Counseling."

95.     Under NMBPD policy a Category A violation is less serious than a Category B violation.

96.     The violations Mr. Anderson was accused of were two Category A violations.

97.     Major Pinillos and Deputy Chief Ford told Mr. Anderson that according to policy, his Category A violations would be combined and treated as a more serious Category B violation.

98.     And because of this, Mr. Anderson could not appeal the violations through the standard grievance process.

99.     Mr. Anderson was labeled as a bad supervisor and a potential racist. The memo argues that Mr. Anderson was solely to blame for the low morale on his shift, omitting the fact that he was under direct orders from his command staff to hold officers accountable.

100.     Sergeant Hancsak and Mr. Anderson (both white males) seem to have been the only supervisors held to these demands. Furthermore, Mr. Anderson did not unfairly target any specific individual nor go looking for violations. He simply addressed problems as they came to him, usually handling them with nothing more than a conversation.

**The Morale Problem at NMBPD**

101.     The reasons for low morale across the agency have been stated ad nauseam throughout multiple inquiries and simply come down to the following:

- Uncompetitive pay and benefits as compared to other agencies.

- Undesirable working conditions due to personnel shortages and the agencies' inability to retain qualified officers.

- Perceived preferential/unequal treatment in regard to discipline and opportunities for advancement.

- Supervisors not correcting inappropriate subordinate conduct.

- Bureaucratic encroachment, micro managerialism, and political interference from city hall on police matters.

102.     Instead of addressing the above issues, Chief Smith created a false narrative to solely hold Mr. Anderson responsible for her lack of leadership.

103.     As a first line supervisor, there were morale issues within Mr. Anderson's control and out of his control. The most obvious example within his control was to treat people fairly and equally, which he has done and that is supported by his record.

104.     There are also factors that are out of Mr. Anderson's control, which have been outlined above, and he cannot be held responsible for.

105.     Mr. Anderson has always cared about his fellow officers and their morale throughout his career, but uplifting morale cannot come at the expense of professional standards and accountability.

106.     The memo's assertion that "Sergeant Anderson did violate the above NMBP-DRR by not making sure that morale was high or find a solution to improve morale." is patently false.

107.     Short of abolishing the police department's policies and procedures, Mr. Anderson has always been open to suggestions on improving morale, which NMBPD leadership could not provide.

108.     It should also be noted that during private conversations both IA investigators, Sergeant Jurado and Detective Shawnetta Anderson outwardly concluded that these particular officers staged this protest because Mr. Anderson was one of the only patrol supervisors actively correcting employee misconduct and, therefore, would be the odd man out and bad guy as officers from other shifts were observed getting away with similar behavior and not being held accountable.

**Even More Disparate Treatment**

109.     Mr. Anderson expressed his intent to take the issue up with the city manager. Major Pinillos and Deputy Chief Ford initially thought that Mr. Anderson had the right to do so and advised they would facilitate the meeting. However, after the meeting had concluded, Major Pinillos told Mr. Anderson privately, that Deputy Chief Ford told him to not let Mr. Anderson speak with the city manager.

110.     Major Pinillos said Deputy Chief Ford said things will "go badly" for Anderson if he chose to speak to the city manager.

111.     Mr. Anderson then asked Sergeant Jurado for copies of the entire investigative case file. Sergeant Jurado called Mr. Anderson and was apologetic. He stated he argued with Chief

Smith for 45 minutes about her request to change the findings of his investigation, however, he was ultimately overruled and ordered to rewrite the conclusion of his investigation, shifting the blame entirely onto Anderson.

112.    It remains unclear as to why this meddling into the findings of the official investigation took place, however, all available evidence suggests that Chief Smith wanted to stack what was initially found to be a Class A violation, into two concurrent Class A violations, which would raise the classification to a Class B violation, and ultimately serve as a pretext to justify her reasoning behind using the historically unusual "Rule of Three" that allowed her to not promote Mr. Anderson even though he was number one on the captain's exam.

113.    A few hours after Mr. Anderson was presented with the findings of the investigation, Major Pinillos, Deputy Chief Ford, and Chief Smith requested to meet with him. Major Pinillos informed Chief Smith that Mr. Anderson had reviewed the memo and disagreed with the findings.

114.    Chief Smith shrugged her shoulders and changed the subject to the recently published results of the Captain's Promotional Exam. Chief Smith stated although Mr. Anderson scored the highest out of every other candidate, she was asserting her right as the Chief to enact the "Rule of Three" and would skip him in upcoming promotions.

115.    Mr. Anderson asked Chief Smith to provide further insight, but she refused.

116.    Mr. Anderson found it extremely disconcerting that Chief Smith was unable or unwilling to speak to him at all throughout this entire ordeal, despite Mr. Anderson's multiple requests to do so before, during, and after this investigation.

117.    Chief Smith personally encouraged Mr. Anderson to take the Captain's Exam during a one-on-one meeting with her before this incident, then she was seemingly unwilling to provide

any feedback, guidance, or constructive criticism on things Mr. Anderson could or should have done to reach his career goals.

118.    Mr. Anderson was informed that Chief Smith and her command staff attended afternoon shift rollcall after the meeting. The reason for this rollcall appearance was to publicly address her decision to skip Mr. Anderson on upcoming promotions.

119.    During this rollcall, Chief Smith stated that this was her right, and she was supported by her command staff and the police union in doing so. Members of her command staff that were present later contacted Mr. Anderson to inform him they were "put on the spot" and "set up" by Chief Smith to publicly agree with her, despite the fact that they adamantly disagreed with this decision.

120.    However, due to the recent findings of the Blue Courage Assessment and Survey of the NMBPD, and a command staff meeting with the city manager, they were compelled to appear "unified" with the Chief's decisions.

121.    Based on the Chief's public statement that the union was consulted and agreed with this decision, Mr. Anderson sent the union president and vice president a message asking if this was true. The Police Union President, Rafael Florencio, stated Chief Smith never spoke to either of them about this decision, and the Union has no public stance on her decision. Mr. Anderson asked the union president to correct the record in an email publicly since Chief Smith invoked the union in her public statements in rollcall, but this clarification by the union was never made.

122.    Mr. Anderson called Sergeant Jurado on September 15, 2023, to once again request copies of the entire investigative case file for his records. They engaged in a bit of small talk, during which time Sergeant Jurado told Mr. Anderson that he had purchased his time back to retire

early, that this case made him decide he did not want to be a cop anymore, and he couldn't bear dealing with the divisive politics at the NMBPD any longer.

123.    Mr. Anderson told Sergeant Jurado that he was sorry he felt that way, but since he was prepared to retire early anyway, because of this incident, why not push back against Chief Smith when she ordered him to rewrite the conclusion of his investigation.

124.    Sergeant Jurado seemed to take offense to this question. He reminded Mr. Anderson that he did argue with Chief Smith for over 45 minutes about it but was ultimately overruled.

125.    Sergeant Jurado then began to defend Chief Smith's decision. Mr. Anderson then debated the merits of this case with him in a calm, respectful manner. Sergeant Jurado suggested this was a lesson that Mr. Anderson needed to learn, that he should not trust the people he worked with.

126.    Sergeant Jurado seemed to do a 180 on his initial stance and now seemed to be determined to get Mr. Anderson to admit he had done something wrong or was somehow responsible for this incident.

127.    Mr. Anderson stated something to the effect of "You've been a supervisor for a lot longer than Harvette; you've also had years of investigative experience, whereas Harvette has had none, so her ordering you to rewrite the findings of your investigation seems like corruption to me," and he replied:  "all I can tell you is be careful what you say and who you say it to."

128.    Mr. Anderson told him that, based on the transparent identity politics that have saturated the City and NMBPD over recent years, and the fact that Chief Smith could not provide him with a rational explanation of her thought process for how he was treated, Mr. Anderson was left to conclude the unprecedented treatment he endured was due to his skin color.

129.    Mr. Anderson then stated something to the effect of "anyone who allowed me to be treated like a criminal while simultaneously looking the other way at serious officer misconduct is a political coward." After he said that, Sergeant Jurado stated, "This conversation is over," and hung up the phone.

**Targeted for Speaking Out**

130.    The following day, Mr. Anderson attended a staff meeting in Chief Smith's conference room with all other department leaders in attendance.

131.    During the meeting, the floor was opened for people to bring up any issues they felt were important. Some had taken the opportunity to bring up some performance-related issues with the younger officers and Field Training Program.

132.    Mr. Anderson decided to speak up and remind the administrators that there is still a perception of favoritism, selective enforcement, and preferential treatment, which was brought up in the Blue Courage Surveys. Mr. Anderson also suggested they should be reaching out to the numerous people who have retired early or resigned from the department if administrators wanted genuine feedback to begin correcting the low morale within the department.

133.    With Sergeant Jurado's refusal to hand over the investigative file, Mr. Anderson contacted Detective Shaunetta Anderson and asked her if she had access to the case file for his records. She said she did and provided Mr. Anderson with a thumb drive the following day.

134.    Mr. Anderson read the findings of Sergeant Jurado's investigation and found it to be expertly and meticulously written in a fair and impartial manner. Having previously believed the totality of his findings were in the Employee Warning Mr. Anderson had received, he felt compelled to send him a message expressing his thoughts. Mr. Anderson told Sergeant Jurado that he was appreciative of his efforts and honesty in uncovering the truth of the investigation, and that

his findings were truthful, however, it was the interpretation and course of action by Chief Smith that he vehemently disagreed with.

135.    Mr. Anderson returned to work after a two-week vacation, trying to move forward and not to be overly negative about the things that were out of his control.

136.    His shift went fine and towards the latter half he attended the afternoon shift rollcall where the newly promoted captains were addressing the officers. During the roll call, Chief Smith stepped into the doorway briefly, greeted the personnel in attendance, and went on her way.

137.    When the rollcall was finished, newly promoted Captain Dukens Sanon asked to speak with Mr. Anderson in his office. Mr. Anderson responded to Captain Sanon's office and was met by Captain Sanon and another newly promoted Captain, Jon Wilson.

138.    Captain Sanon told Mr. Anderson that Chief Smith ordered him to tell Mr. Anderson that she felt as though he "looked at her wrong" during afternoon shift rollcall.

139.    Mr. Anderson asked Captain Sanon if he could explain what Chief Smith meant by that, and if he could be more descriptive about what she said Mr. Anderson did to make her feel that way.

140.    Captain Sanon said Chief Smith told him she felt like Mr. Anderson was "trying to kill her with his eyes." Both captains shared a look of befuddlement and appeared to be as taken aback by the Chief's comment as Mr. Anderson was while he was being told.

141.    Mr. Anderson told them he would try to be mindful of where he "aims his eyes" in the future and sent an email afterward to express his sincere apology for any miscommunication.

**Constructive Termination**

142.    Captain Sanon then presented Mr. Anderson with an envelope. Mr. Anderson opened it and learned it was a new internal investigation, where he was being accused of using

"offensive language" and "conduct unbecoming." Captain Sanon did not go into detail about the allegation but said he would have a chance to review it during an administrative review once he got back from a two-week training Mr. Anderson was scheduled to attend. Upon being handed this document it became clear to Mr. Anderson that he was being targeted by Chief Smith and her staff.

143.    Based on the frivolous nature of each complaint against him, which all began under Chief Smith's appointment, as well as the Chief's "he looked at me wrong" bullying tactic, Mr. Anderson believed he was being set up for demotion or termination due to his unwillingness to back down from defending himself and his reputation for opposing this blatant unfairness, discrimination, corruption, and attempted character assassination.

144.    In over five years of working in a supervisory capacity, Mr. Anderson's leadership methods and abilities had never been questioned. Conversely, before this incident, administrators routinely praised Mr. Anderson for his work ethic and dedication to the role.

145.    After two weeks in training, Mr. Anderson returned to work and attended his administrative review with Captain Sanon and Captain Michael Chinchilla.

146.    Mr. Anderson learned that the new investigation stemmed from the private phone call with Sergeant Jurado. The "offensive language" and "conduct unbecoming" charges stemmed from Mr. Anderson's comments wherein Mr. Anderson stated, "her ordering you to rewrite the findings of your investigation seems like corruption to me" and "anyone who allowed me to be treated like a criminal while simultaneously looking the other way at serious officer misconduct is a political coward."

147.    Anderson completed the interview with internal affairs, explaining that, based on the way this situation unfolded, he stood by his statements, violated no policy, and that he was well

within his constitutional rights to say what he believed during a private off-duty phone call with a personal friend.

148.    Mr. Anderson used several days of accrued leave and retired on December 1st, 2023. He took out a loan of over $115,000.00 to purchase his remaining time in the pension system and submitted a memo expressing his intent to retire and use his remaining accrued leave.

149.    Mr. Anderson believes an important dynamic of this event was the divisive identity politics that had been at play in the NMBPD, which began a few years ago under the previous city manager and had continued under Chief Smith.

150.    The city leadership was outwardly championing a pro-black/anti-white agenda. The city manager proclaimed in meetings that North Miami Beach was a "Black City." City leaders remarked in public forums that the NMBPD administration had been "too white" historically. The city manager reportedly told members of the department that white males would no longer be considered for senior leadership positions within the agency. Administrators spoke openly about selecting personnel based on skin color rather than experience or competence. New members of command staff were brought in from the outside, and bogus administrative positions were created by the former city manager. All these positions were filled by African American or Haitian males with no existing ties to North Miami Beach. Some new administrators wore "Black Lives Matter" lapel pins to city functions and were not subtle about their personal politics.

151.    Anderson had been repeatedly ordered to look the other way by Chief Smith and her command staff when he pointed out inequities in the Reserve Officer Program, wherein two black former administrators were granted unequal privileges and not required to perform the standards asked of other officers.

152.    The only patrol supervisors to have faced disciplinary action in recent years all happened to be white males, which seems statistically unlikely because white males were a minority demographic of patrol sergeants. All these disciplinary measures were spearheaded by Captain Diaz and were all later deemed to be excessive and appeared to have been instances of selective enforcement.

153.    After new elections were held, a turnover in city leadership and the appointment of the new city manager, Chief Smith openly stated in public forums she believed her leadership abilities and qualifications as Chief were under scrutiny, not because she was unqualified or inexperienced, but because she is a black female.

154.    It is the belief of Mr. Anderson and many others who were forced to retire that never in the history of the NMBPD had any officer or sergeant been subjected to such an unwarranted and unjustifiable humiliation ritual. In fact, assuming the initial allegations against Mr. Anderson had been genuine, there were many examples of sergeants alleged to have committed similar or worse conduct that were never relieved of duty nor passed over for a promotion.

155.    The fact that for six months Mr. Anderson had been prohibited from speaking publicly about this matter, and unable to counteract the defamatory rumors about him without risking further disciplinary action, this ordeal amounted to an apparent punishment through strategic proceduralism without any care or consideration for his professional reputation. This was a disgraceful, organized attempt to assassinate the character of a dedicated sergeant guilty of nothing but doing his job.

156.    Equally, nothing was done about the unethical conduct of some former officers despite the internal affairs interviews revealing serious ethical concerns, failing standards, and

substantial liability from conduct Mr. Anderson was correcting on a routine basis while assigned to the midnight shift.

157.    Further information contained in this lawsuit can be found on the following YouTube video: https://youtu.be/ftadCg0J6-M?si=8e0mKjnLJgbKa3pU.

## DAMAGES

158.    Mr. Anderson has suffered extensive financial damage. They include:

1.  Loss of $115,430.00 spent in order to retire early.

2.  Loss of the remaining salary that he would have earned after completing his full 20-year career (2.75 years), as well as salary he would have earned in the 8-year drop program (annual sergeant salary/benefits approximately $132,000 X 10.75) = Approximately $1,419,000.00.

3.  Salary increases from his promotion to Captain.

4.  Significantly Reduced Pension Payment.

5.  Loss of leave payout and other City benefits.

159.    Damages so far are in excess of $1,554,430.00.

## COUNT I
## TITLE VII
## RACE DISCRIMINATION, RETALIATION & DISPARATE TREATMENT

160.    Paragraphs 1 through 159 are realleged as if fully rewritten herein.

161.    The City of North Miami Beach, its agents and employees, to include Chief Smith, engaged in discrimination based on race as heretofore described by its disparate administration of conditions of employment.

162.    The culmination of the disparities in the treatment of Mr. Anderson by Chief Smith and her staff was so unbearable that it forced Mr. Anderson into early retirement.

WHEREFORE, Mr. Anderson demands judgment against Defendant:

A.  For lost wages and all other sums of money, including retirement benefits, accrued sick and leave pay, health insurance, life insurance, disability insurance, all fringe benefits, and all other employment benefits that were lost, together with interest on said amounts;

B.  For compensatory and punitive damages;

C.  For entry of an order declaring Defendants' employment practices unlawful; and

D.  For the costs of this action, including an award of reasonable attorney's fees pursuant to 29 U.S. C. section 626(b) and 216 (b).

**COUNT II**
**TITLE VII**
**RETALIATION – OPPOSITION CLAUSE**

163.    Paragraphs 1 through 159 are realleged as if fully rewritten herein.

164.    The City of North Miami Beach, its agents and employees, to include Chief Smith, violated Title VII's Opposition Clause by retaliation against Mr. Anderson for his opposition to discrimination by the police department within the City of North Miami Beach, and its reporting of the same.

165.    As a direct and proximate cause of said acts, Mr. Anderson has suffered and continues to suffer from forced retirement, loss of income, loss of employment benefits, distress, humiliation, great expense, embarrassment, and damage to his reputation.

WHEREFORE, Mr. Anderson demands judgment against Defendants:

A.  For lost wages and all other sums of money, including retirement benefits, accrued sick and leave pay, health insurance, life insurance, disability insurance, all fringe benefits,

and all other employment benefits which were lost, together with interest on said amounts;

B.  For compensatory and punitive damages;

C.  For entry of an order declaring Defendants' employment practices unlawful; and

D.  For the costs of this action, including an award of reasonable attorney's fees pursuant to 29 U.S. C. section 626(b) and 216 (b).

## COUNT III
### 42 U.S.C. §1983
### MUNICIPAL CUSTOM/POLICY OF RACE DISCRIMINATION

166.    Paragraphs 1 through 159 are realleged as if fully rewritten herein.

167.    The City of North Miami Beach, its agents and employees, to include Chief Smith, adopted and tolerated a municipal custom or policy of race discrimination.

168.    Defendants refused to remedy the race discrimination against Mr. Anderson and other employees of the NMBPD complained of and retaliated against Mr. Anderson and other employees of the NMBPD, evidenced by this custom/policy.

169.    As a direct and proximate cause of said acts, Mr. Anderson has suffered and continues to suffer loss of employment, loss of income, loss of employment benefits, distress, humiliation, great expense, embarrassment, and damage to his reputation.

WHEREFORE, Mr. Anderson demands judgment against Defendant:

A.  For lost wages and all other sums of money, including retirement benefits, accrued sick and leave pay, health insurance, life insurance, disability insurance, all fringe benefits, and all other employment benefits that were lost, together with interest on said amounts;

B.  For compensatory and punitive damages;

28

C.  For entry of an order declaring Defendants' employment practices unlawful; and

D.  For the costs of this action, including an award of reasonable attorney's fees pursuant to 29 U.S.C. section 626(b) and 216 (b).

**COUNT IV**
**FLORIDA CIVIL RIGHTS ACT OF 1992 – RACE**
**RACE DISCRIMINATION, RETALIATION & DISPARATE TREATMENT**

170.   Paragraphs 1 through 159 are realleged as if fully rewritten herein.

171.   The City of North Miami Beach, its agents and employees, to include Chief Smith, committed the above-described discriminatory treatment of Mr. Anderson and other employees of the NMBPD which violated the Florida Civil Rights Act of 1992, Fla. Stat. §760.10's prohibition on race discrimination, including retaliation for opposing said behavior, disparate treatment and forced retirement.

172.   Defendants have intentionally discriminated against Mr. Anderson in violation of the Florida Civil Rights Act's proscription of race discrimination, causing pain, suffering, and humiliation.

WHEREFORE, Mr. Anderson demands judgment against Defendant:

A.  For lost wages and all other sums of money, including retirement benefits, accrued sick and leave pay, health insurance, life insurance, disability insurance, all fringe benefits, and all other employment benefits which were lost, together with interest on said amounts;

B.  For compensatory and punitive damages;

C.  For entry of an order declaring Defendants' employment practices unlawful; and

D.  For the costs of this action, including an award of reasonable attorney's fees pursuant to §760.11(5), Fla. Stat.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedures, Mr. Anderson demands a

trial by jury in this action.

Respectfully submitted on December 18, 2024.

/s/Ignacio M. Alvarez
Ignacio M. Alvarez
Florida Bar No. 40572
Gavin L. Sinclair
Florida Bar No. 1058321

ALGO Law Firm, LLP
815 Ponce De Leon Blvd.,
Suite 101
Coral Gables, Florida 33132
T: (305) 723-1876
Imalvarez@algofirm.com
gsinclair@algofirm.com

<span style="color:red">EXHIBIT A</span>

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Miami District Office**
100 SE 2nd St, Suite 1500
Miami, FL 33131
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/11/2024

**To:** Mr. Karl J. Anderson
1700 S curlew ln
HOMESTEAD, FL 33035
Charge No: 510-2024-08780

EEOC Representative and email:   EDGAR COLE
Investigator
Edgar.Cole@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 510-2024-08780.

On behalf of the Commission,

```
Digitally Signed By:Evangeline Hawthorne
07/11/2024
```

Evangeline Hawthorne
Director

**Cc:**


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC
*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 510-2024-08780 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500, Miami, FL 33131.

**<u>To make a Section 83 request for your charge file</u>**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 510-2024-08780 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500, Miami, FL 33131.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to
https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.